IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ERIK R. THOMPSON,       )
    Plaintiff,       )
                  )
        v.       )       Civil No. 3:16cv815 (MHL)
                  )
NANCY A. BERRYHILL,       )
Acting Commissioner of Social Security,       )
    Defendant.       )

REPORT AND RECOMMENDATION

On December 16, 2014, Erik R. Thompson ("Plaintiff") applied for Social Security Disability Benefits ("DIB") under the Social Security Act ("Act"), alleging disability from fibromyalgia, degenerative disc disease, irritable bowel syndrome ("IBS"), anxiety disorders (including posttraumatic stress disorder ("PTSD")), organic mental disorders and affective disorders, with an alleged onset date of December 8, 2014. The Social Security Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision, and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner.

Plaintiff seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred by failing to properly evaluate the medical evidence and medical opinions of Plaintiff's treating physicians, and by failing to give proper weight to a determination of disability made by the Department of Veterans Affairs ("VA"). (Pl.'s Br. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 11) at 5–6.) This matter now comes before the

Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter now ripe for review.[1]  For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 12) be DENIED and that the final decision of the Commissioner be REVERSED and REMANDED.

## I.    PROCEDURAL HISTORY

On December 16, 2014, Plaintiff filed an application for DIB with an alleged onset date of December 8, 2014. (R. at 162–63.)  The SSA denied the claim initially on April 17, 2015, and again upon reconsideration on September 18, 2015. (R. at 15, 51–67, 69–82.)  At Plaintiff's written request, the ALJ held a hearing on January 7, 2016. (R. at 33–50, 101–02.)  On March 11, 2016, the ALJ issued a written opinion denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act, because he could perform work that exists in the national economy. (R. at 27–28.)  On August 8, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1–3.)

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the [SSA]'s disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634

---

[1]    The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth) and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

(4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of "relevant evidence [that] a reasonable mind [could] accept as adequate to support a conclusion." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

In considering the decision of the Commissioner based on the record as a whole, the court must "tak[e] into account . . . 'whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). If substantial evidence in the record supports the Commissioner's findings as to any fact, then the reviewing court must affirm regardless of whether the court disagrees with such findings. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996). The court must reverse the decision if substantial evidence does not support the ALJ's determination or if the ALJ makes an error of law. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements.

§ 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite his physical and mental limitations. § 404.1545(a). At step four, the ALJ assesses whether the claimant can perform his past work given his RFC. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

### III.    THE ALJ'S DECISION

On January 7, 2016, the ALJ held a hearing during which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. (R. at 33.) On March 11, 2016, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 12–32.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 16–28.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (R. at 17.) At step two, the ALJ determined that Plaintiff had the following severe impairments: fibromyalgia; degenerative disc disease; IBS; anxiety disorders (including PTSD); organic mental disorders; and, affective disorders. (R. at 18.) Then, at step three, the ALJ found that Plaintiff did not have any impairment or combination of impairments that met or medically equaled the severity of one of the impairments in the listings. (R. at 19–21.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform less than a full range of sedentary work. (R. at 21.) He could occasionally climb, stoop, kneel, crouch and crawl, but he could frequently balance. (R. at 21.) Plaintiff could never have concentrated

4

exposure to vibrations, and the ALJ limited him to simple, routine tasks with no more than occasional changes in the work setting. (R. at 21.)  Finally, he could have occasional contact with supervisors and co-workers, but no interaction with the public. (R. at 21.)

At step four, the ALJ found that Plaintiff could not perform any of his past relevant work. (R. at 26.)  At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 27.)  Therefore, Plaintiff did not qualify as disabled under the Act. (R. at 28.)

## IV.    ANALYSIS

Plaintiff, forty-two years old at the time of this Report and Recommendation, previously worked as a collection clerk, maintenance technician and supply and inventory specialist. (R. at 48, 162, 212–20.)  He applied for Social Security Benefits, alleging disability from fibromyalgia, degenerative disc disease, IBS, anxiety disorders (including PTSD), organic mental disorders and affective disorders, with an alleged onset date of December 8, 2014. (R. at 162–63, 199.)  Plaintiff's appeal to this Court alleges that the ALJ erred by (1) failing to properly evaluate the medical evidence and medical opinions submitted by Plaintiff's treating physicians and (2) failing to give proper weight to the VA disability determination. (Pl.'s Mem. at 5–6, 14.)  For the reasons set forth below, the ALJ erred in his evaluation of the VA disability decision.

### A. Substantial evidence supports the weight that the ALJ assigned to Plaintiff's treating physicians.

Plaintiff argues that the ALJ erred by failing to properly evaluate the medical opinions of his treating physicians. (Pl.'s Mem. at 6.)  Specifically, Plaintiff argues that the following factors led to the ALJ's failure to accord proper weight to the medical opinions:  (1) the ALJ emphasized evidence less favorable to Plaintiff while ignoring favorable evidence; (2) the ALJ mischaracterized evidence by omitting critical evidence in the record that indicated Plaintiff's

medical conditions; and, (3) the ALJ emphasized that Plaintiff's reported activities allegedly conflicted with the evidence of record without explaining the conflict. (Pl.'s Mem. at 6–14.) Defendant responds that the ALJ properly assigned weight to the opinions of the treating physicians, because the ALJ found inconsistencies between the physicians' opinions and substantial objective evidence throughout the record. (Def.'s Mot. for Summ. J. & Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 12) at 14–23.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment (or combination of impairments), which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the medical records that Plaintiff provides and any medical evidence resulting from consultative examinations or medical expert evaluations. 20 C.F.R. § 404.1512(b).

Under the applicable regulations and case law, the ALJ must give controlling weight to a treating physician's opinion if medically acceptable clinical and laboratory diagnostic techniques support it, and the opinion comports with substantial evidence in the record. *Lewis v. Berryhill*, 858 F. 3d 858, 867 (4th Cir. 2017); 20 C.F.R. § 404.1527(c)(2) (2014); SSR 96-2p.[2] Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation. §§ 404.1527(c)(3)-(4), (d). For example, the ALJ need not accept a treating physician's opinion

---

[2]    Effective March 27, 2017, the SSA rescinded SSR 96-2p, and it no longer applies the "treating physician rule." 20 C.F.R. § 404.1520c (2017). Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency. §§ 404.1520c(a), (c)(1)-(2). Plaintiff filed his claim on December 16, 2014, before this regulation took effect. (R. at 162-63.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, the Court will review the ALJ's decision under the old rule codified by 20 C.F.R. § 404.1527.

when the physician decides a claimant's disability status for purposes of employment (an issue reserved solely for the Commissioner), or when the treating physician's opinion does not comport with other evidence or lacks substantial support. *Id.*

Generally, courts should not disturb an ALJ's decision as to the weight afforded to a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding the weight afforded to a medical opinion should remain untouched unless the ALJ failed to give a sufficient reason for the weight afforded. § 404.1527(d). The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. § 404.1527(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether to classify a claimant as "disabled" as defined under the Act. § 404.1527(d)(1). If, however, the ALJ finds inconsistencies among the medical opinions or other evidence, then the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. § 404.1527(c)(2).

When considering a treating source's opinion, the ALJ must evaluate those findings just as any other medical opinion. § 404.1527(b)–(c). Determining the specific weight of medical opinions serves an important purpose, because the regulations further require a comparative analysis of competing medical opinions. *See, e.g.*, § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the opinion of a source who examined [claimant] than to

7

the opinion of a source who has not examined [claimant]."). The ALJ must "always give good reasons in [the] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's medical opinion." § 404.1527(c)(2); SSR 96-2p, at *5. The Commissioner's opinion must "contain specific reasons for the weight given to the treating source's medical opinion, [have support from] evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, at *5.

Requiring an ALJ to assign specific weight to medical opinions remains necessary, because a reviewing court "face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence." *Arnold v. Sec'y of Health Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977). Unless the ALJ "has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Id.* (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)) (internal quotation marks omitted). Accordingly, a reviewing court cannot determine if substantial evidence supports an ALJ's findings "unless the [ALJ] explicitly indicates the weight given to all the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citing *Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980); *Strawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold*, 567 F.2d at 259)).

Here, the ALJ properly assigned little weight to the medical opinions of three of Plaintiff's treating physicians — Deborah Caruso, M.D.; Ifeyinwa Utah, M.D.; and, Toni Harris, Ph.D., — and a treating kinesiotherapist, Mr. Carlos Moffett. (R. at 24–25.)

### 1. Dr. Caruso's Opinion

The ALJ did not err in assigning little weight to Dr. Caruso's opinion and offered specific reasoning for the weight assigned. Dr. Caruso, a board-certified spinal cord injury physician at the VA Medical Center, treated Plaintiff for cervical stenosis every three to four months from November 13, 2014, to November 30, 2015. (R. at 189–90, 1743, 1824, 1867.) In her December 11, 2015 Physician's Questionnaire ("Questionnaire"), Dr. Caruso opined that Plaintiff could sit and stand/walk less than two hours in an eight-hour workday, and that he could rarely lift and carry twenty pounds and occasionally lift or carry ten pounds or less. (R. at 1821–24.) The ALJ gave little weight to Dr. Caruso's opinion, because he found it "generally inconsistent with the evidence of record" and "specifically, because [Plaintiff] had [only] stable diffuse mild-to-moderate cervical spondylosis from C3 through C7." (R. at 24.) Substantial evidence supports the ALJ's decision.

First, Dr. Caruso's Questionnaire heavily draws from a functional capacity examination ("FCE") that Dr. Caruso herself did not conduct with Plaintiff. (R. at 1821–24.) In the Questionnaire, Dr. Caruso identified cervical stenosis as Plaintiff's only diagnosis with symptoms of chronic neuropathic pain and gait instability. (R. at 1821.) She further identified tenderness, anxiety, abnormal gait and tingling/numbness as objective signs of Plaintiff's impairments. (R. at 1821.) Dr. Caruso noted that clinical findings and test results showed hyper-reflexive lower extremities and 4/5 wrist extension or finger flexion. (R. at 1821.)

However, Dr. Caruso left much of the Questionnaire incomplete. (R. at 1821–24.) She did not discuss whether Plaintiff had limitations with spinal motion, nor did she comment on Plaintiff's attention and concentration abilities, because the FCE featured neither test. (R. at 1821–22.) Dr. Caruso also did not test Plaintiff's ability to walk, but she opined that Plaintiff

could only sit, stand or walk less than two hours total in an eight-hour workday with normal breaks. (R. at 1822.) Furthermore, she noted that Plaintiff would not need to elevate his legs with prolonged sitting, but he must use a cane or other assistive device while standing or walking as "recommended by [the] FCE." (R. at 1822–23.) Although she never assessed his functional abilities, Dr. Caruso also stated that Plaintiff could never lift or carry fifty pounds, rarely lift or carry twenty pounds, and occasionally lift or carry ten pounds or less. (R. at 1823.)

Additionally, Dr. Caruso stated that Plaintiff had postural limitations such that he could frequently climb ramps or stairs, but could only occasionally balance, stoop or kneel. (R. at 1823.) She did not discuss Plaintiff's ability to climb ladders, ropes or scaffolds, or crouch and crawl, because the FCE did not test those capabilities. (R. at 1823.) Finally, Dr. Caruso noted that Plaintiff's history of anxiety disorder and PTSD would affect his ability to work, but she did not opine how often Plaintiff would likely miss work because of his impairments. (R. at 1823–24.) Instead, Dr. Caruso opined that Plaintiff's work absences would "depend[] on [the] work environment." (R. at 1823.) Thus, the ALJ properly assigned little weight to Dr. Caruso's opinion, because she relied on the FCE instead of her own examinations of Plaintiff.

Second, Dr. Caruso's opinion regarding Plaintiff's severe spinal condition conflicts with her own examination notes and reports. On November 13, 2014, Plaintiff first presented to Dr. Caruso with upper and lower back pain. (R. at 1090.) During the physical exam, Dr. Caruso indicated that Plaintiff had "no distress" in general and no muscle atrophy except "mild wasting of lumbar paravertebral muscles." (R. at 1093.) Although Plaintiff had limited range of motion in flexion, extension, lateral flexion and lateral rotation, Dr. Caruso noted that Plaintiff's cervical spine appeared normal. (R. at 1093–94.) Plaintiff experienced pain during provocative testing, had a slow, nonantalgic gait and kyphotic posture. (R. at 1094.) However, Plaintiff's

10

lumbar/sacral spine and cervical spine exams showed normal lordosis with tenderness to touch. (R. at 1093–94.) Dr. Caruso assessed Plaintiff with moderate-to-severe spinal canal stenosis at C5-C6 and opined that his spinal condition likely caused his pain. (R. at 1095.) Nevertheless, Dr. Caruso noted Plaintiff's intact reflexes, except for the triceps reflex for which she could not test. (R. at 1095.) Dr. Caruso also concluded that Plaintiff's pain in his mid to low back seemed myofascial in nature, but his sacroiliac joint maneuvers showed possible joint inflammation. (R. at 1095–96.) Dr. Caruso's treatment plan included a neurology consultation for migraines and a TENS unit evaluation through physical therapy. (R. at 1096.)

On October 15, 2015, Plaintiff returned to Dr. Caruso for his chronic neck and low back pain. (R. at 1743.) Dr. Caruso assessed Plaintiff as a "well[-]developed, well[-]nourished male in no distress." (R. at 1746.) Plaintiff had a negative Hoffmann's reflex test indicating no nerve injury, and all strength testing presented normal, except 4/5 wrist extension, finger flexion and fifth digit abduction. (R. at 1746.) However, Dr. Caruso deferred provocative testing of Plaintiff's neck and back, because it "exacerbate[d] his pain." (R. at 1746.) Dr. Caruso noted that Plaintiff's cervical spine imaging concerned her, because he had severe stenosis at C5-C6. (R. at 1747.) She recommended acupuncture and a two-week alpha stimulation trial. (R. at 1747.) On November 10, 2015, Dr. Caruso informed Plaintiff that the most recent MRI showed that his condition had not changed since his previous MRI on January 16, 2015. (R. at 1035, 1682.)

On November 30, 2015, Plaintiff returned to Dr. Caruso for his second session of alpha stimulation. (R. at 1867.) Plaintiff recalled leaving her clinic in less pain and anxiety after the first session. (R. at 1867.) Additionally, Dr. Caruso reviewed with Plaintiff his most recent MRI and the improvements in his condition. (R. at 1867.) Plaintiff reported that his arms no longer

11

felt numb when he woke, and he agreed to revisit the pain clinic. (R. at 1867.) Dr. Caruso also

opined that Plaintiff "most likely [did] not need neurosurgery based on [the] new MRI." (R. at

1867.) Dr. Caruso prescribed alpha stimulation sessions to treat Plaintiff's pain, anxiety,

depression and insomnia. (R. at 1870.) Most importantly, Plaintiff completed the TENS unit

session, and Plaintiff's pain score dropped from four (at the beginning) to two (at the end). (R. at

1870–71.) Dr. Caruso planned to order a unit for Plaintiff's home use. (R. at 1871.)

Dr. Caruso's own observations do not support her opinion. Her medical examinations

indicated that Plaintiff's spinal condition had not deteriorated over the year. (R. at 1682.) In

treatment notes, Dr. Caruso characterized Plaintiff's chronic pain and numbness as only

moderate in nature. (R. at 1822.) Although Plaintiff still had some mobility limitations, the

alpha stimulation sessions lessened his pain, and Dr. Caruso noted that Plaintiff would not need

corrective surgery. (R. at 1867, 1870–71.) Dr. Caruso consistently noted Plaintiff's normal

cervical spine, normal strength and no distress. (R. at 1093–94, 1746.)

Third, objective medical evidence in the record shows that Plaintiff had broader physical

ability than Dr. Caruso opined. Specifically, Dr. Caruso classified Plaintiff's spinal condition

more severely than his other treating physicians. On January 16, 2015, Plaintiff consulted with

neurologist Robert Baldwin, M.D., regarding his persistent headaches. (R. at 1029.) Plaintiff

appeared normal upon examination, with normal bulk, muscle tone, strength and reflexes, as well

as intact coordination. (R. at 1032–33.) Dr. Baldwin also assessed Plaintiff with an antalgic

gait. (R. at 1033.) Plaintiff's MRI of the cervical spine showed "[m]ultilevel degenerative disc

disease most pronounced at C5-C6 with moderate-to-severe spinal canal stenosis and . . .

bilateral neuroforaminal narrowing." (R. at 1035.) However, Plaintiff's MRI of the lumbar

spine showed "[n]o spinal canal stenosis or neuroforaminal narrowing," but showed "[d]isc

12

space narrowing with concentric disc bulge at L2-L3." (R. at 1035.) Overall, Dr. Baldwin assessed Plaintiff with cervical spine stenosis and chronic resultant neck pain with numbness in his arms and legs. (R. at 1035.) Dr. Baldwin also noted that Plaintiff did not have migraines, but rather suffered from multifactorial headaches with tension or muscle spasms. (R. at 1035.) Dr. Baldwin planned to consult with Dr. Utah regarding Plaintiff's medications. (R. at 1035.)

On April 8, 2015, Plaintiff's MRI revealed that his distal spinal cord signal and L1-L2 appeared unremarkable. (R. at 1603.) Plaintiff again exhibited a "mild concentric bulge without canal stenosis or foraminal narrowing" at L2-L3, but the remainder of the lumbar spine and incidental soft tissue appeared normal. (R. at 1603.) Consequently, Plaintiff exhibited only mild degenerative changes at L2-L3 since his previous MRI. (R. at 1603.)

Dr. Caruso's opinion also does not comport with Plaintiff's primary care physician's opinion. On May 26, 2015, Plaintiff visited Steven Seigel, M.D., for a general examination. (R. at 1555, 1560.) During the exam, Dr. Seigel found Plaintiff generally healthy. (R. at 1559.) Plaintiff had no fatigue, weight change, night sweats, appetite change or sleep change. (R. at 1559.) Plaintiff also showed no signs of visual loss or change, hearing loss, tinnitus or vertigo, chest pain, shortness of breath, wheezing, heart palpitations, irregular heart rhythms, abdominal pain or change in stool. (R. at 1559.) Moreover, Dr. Seigel noted no joint pain, swelling, or restricted motion. (R. at 1559.) Although Plaintiff's test results showed a mild decrease in his upper extremity strength, he had a normal gait. (R. at 1560.) Dr. Seigel's referred Plaintiff for a follow-up with gastroenterology, requested a neurosurgical review of Plaintiff's cervical spinal stenosis test and instructed Plaintiff to continue taking Amitriptyline for pain. (R. at 1560.)

Dr. Seigel examined Plaintiff on May 27, 2015, to complete his "Thoracolumbar Spine Conditions" Disability Benefits Questionnaire. (R. at 1535–45.) Dr. Seigel diagnosed Plaintiff

with lumbar degenerative disc and joint disease with L2-L3 disc bulge, as well as bilateral lumbar radiculopathy. (R. at 1536–37.) Plaintiff had an abnormal range of motion in his back that caused him "limitation[s] in bending, stooping, twisting/turning at waist, and bending to lift." (R. at 1538.) Although Plaintiff did not exhibit muscle spasms, he had localized tenderness resulting in an abnormal, antalgic gait and minor guarding with palpation of the lower spine and paraspinal muscles. (R. at 1539–40.) Dr. Seigel noted that Plaintiff needed to change positions with some frequency and could not stand for prolonged periods. (R. at 1540.) Additionally, Dr. Seigel reported that Plaintiff could not endure frequent bending at the waist or heavy lifting. (R. at 1544.) Nevertheless, Plaintiff's spinal contour remained within normal limits. (R. at 1539–40.) Plaintiff also had normal strength in hip flexion, knee extension, ankle plantar flexion, ankle dorsiflexion and great toe extension. (R. at 1540–41.) Further, Plaintiff showed negative in right and left straight leg tests and showed no signs of ankylosis of the spine. (R. at 1541–42.) Dr. Seigel also noted that Plaintiff occasionally used a cane and constantly used a brace to assist with his lumbar spine condition. (R. at 1543.)

On August 25, 2015, Plaintiff consulted with Muhammad Bhatti, M.D., for frontal/orbital headache pain. (R. at 1792.) Dr. Bhatti's examination yielded unremarkable test results. (R. at 1795–97.) Plaintiff had normal bulk, muscle tone, strength and reflexes. (R. at 1796.) Plaintiff also presented with intact gait. (R. at 1796.) Dr. Bhatti counseled Plaintiff to cease taking analgesic medications daily as they likely caused his headaches. (R. at 1797.)

Per Dr. Seigel's request, on November 4, 2015, Plaintiff underwent another MRI to assess his persistent neck pain. (R. at 1640.) Test results revealed unremarkable cervical alignment, maintained vertebral body heights, and no abnormal marrow signal other than reactive vertebral signal changes secondary to degenerative disc disease at C3-C4. (R. at 1641.)

14

More importantly, Plaintiff presented with "diffuse mild-to-moderate degenerative disc disease from C3 through C7 . . . causing mild spinal stenosis but without compression to the spinal cord." (R. at 1641–42.) Thus, Plaintiff's spinal conditions improved from the "moderate-to-severe" spinal stenosis results from his previous MRI. (R. at 1035, 1641–42.)

On November 10, 2015, Plaintiff returned to Dr. Seigel, and he again appeared generally healthy. (R. at 1684, 1689.) He showed no signs of fatigue, weight change, night sweats, appetite change, sleep change, visual loss or change, hearing loss, shortness of breath, wheezing, heart palpitations, chest pain or abdominal pain. (R. at 1689.) Significantly, Dr. Seigel noted no joint pain, swelling or restricted motion. (R. at 1689.) Plaintiff also had normal reflexes, motor strength and gait, as well as symmetry among all extremities. (R. at 1690.) Dr. Seigel prescribed tramadol for Plaintiff's tension-induced headaches. (R. at 1690.) Dr. Seigel noted that Plaintiff recently started Mesalanine for his colitis and Latuda, as well as an increased prazosin dose for his PTSD, depression and cognitive impairment. (R. at 1690.)

On November 18, 2015, Plaintiff visited cardiologist Kevin Sumption, M.D., who assessed him with mild branch vessel coronary disease. (R. at 1874, 1878.) Dr. Sumption observed that Plaintiff could not walk more than fifty yards before stopping to rest. (R. at 1878.) Dr. Sumption advised Plaintiff to visit the nearest ER if he experienced any chest pain, dyspnea or syncope, and he advised Plaintiff to follow-up in eight months. (R. at 1878.) Dr. Sumption also noted that medication controlled his heart rate and blood pressure well. (R. at 1878.)

Contrary to Dr. Caruso's opinion, Plaintiff's records from other doctors showed that he maintained more functional capacity. Although Plaintiff experienced mobility difficulties and chronic pain, he generally showed normal motor strength, intact reflexes, normal spinal cord, normal brachial (arm) functioning and well-controlled coronary conditions. (R. at 1032–33,

1539–41, 1559–60, 1603, 1641, 1690, 1796, 1878.) Additionally, Plaintiff generally had no swelling or inflammation in his joints. (R. at 1529, 1559, 1689, 1795.) Plaintiff consistently had no changes in weight, no fatigue and no loss of hearing or vision. (R. at 1559, 1689.) Dr. Caruso opined that Plaintiff could only sit and stand/walk less than two hours in an eight-hour work day with normal breaks, yet evidence in the record directly contradicts her opinion. (R. at 1822.) For example, Dr. Seigel noted that Plaintiff's spinal condition caused some functional loss, but otherwise unremarkable effects. (R. at 1535–44.) Plaintiff's spinal condition limited his ability to walk, remain seated or stand for extended time periods, but he could walk approximately fifty yards before stopping to rest. (R. at 1540, 1878.) Consequently, Dr. Caruso's opinion does not comport with the examinations and notes of other medical sources.

Plaintiff's testimony and reported activities of daily living further support the ALJ's assignment of little weight to Dr. Caruso's opinion. (R. at 45.) Plaintiff showered, dressed himself and drove without assistance. (R. at 45.) Although he experienced numbness and stiffness in his leg, Plaintiff testified that he could drive for at least thirty minutes. (R. at 44.) Plaintiff swept, cleaned dishes and cooked microwaveable meals. (R. at 45–46.) Plaintiff testified that he mostly cooked meals that required little effort, particularly because bending to get items out of the refrigerator "sometimes hurts." (R. at 45.) Plaintiff stated that he could sit comfortably for between two and two and a half hours. (R. at 43, 1822.) He reported that he alternated between sitting and standing and changed positions due to pain; however, he could sit for two to three hours before having to stand, and could stand for one to two hours before needing to sit down. (R. at 43–44.) Importantly, Plaintiff stated that he could walk about fifty yards before needing to take a break. (R. at 44.)

The ALJ accounted for Plaintiff's limitations that found support in the record. Plaintiff's RFC reflects limitations in his ability to bend, climb, kneel, crouch and crawl, as noted throughout the record. However, Dr. Caruso's assessment that Plaintiff could only sit and stand/walk less than two hours with breaks does not comport with Plaintiff's own testimony and his normal test results over multiple examinations. The record shows that Plaintiff only had difficulty with prolonged sitting or standing without rest.

In sum, substantial evidence in the record supports the ALJ's assignment of little weight to Dr. Caruso's opinion. Dr. Caruso's opinion conflicts with her own medical examinations, other objective medical in the record and Plaintiff's admitted daily activities.

### 2. Dr. Utah's Opinion

Dr. Utah, a board-certified psychiatrist, treated Plaintiff on August 29, 2014, and every two to three months thereafter until November 10, 2015. (R. at 1041, 1069, 1140, 1221, 1613, 1694, 1812.) Dr. Utah opined that Plaintiff had the following signs and symptoms: short, intermediate, or long-term memory impairment; loss of interest in pleasurable activities; poor appetite; sleep disturbance; decreased energy; feelings of worthlessness and hopelessness; recurrent and intrusive recollections of a traumatic experience; emotional withdrawal and/or isolation; vigilance and scanning; appetite disturbance with weight change; and, generalized persistent anxiety. (R. at 1611–12.) Dr. Utah also evaluated Plaintiff's prognosis as "guarded." (R. at 1612.) Further, he noted that Plaintiff had marked difficulties in maintaining social functioning and deficiencies in maintaining concentration. (R. at 1613.) Dr. Utah opined that Plaintiff's "moderate depressions . . . poor concentration, loss of interest and low energy level [would] limit his ability to keep a regular job," and that Plaintiff would miss work more than three times per month. (R. at 1612.)

The ALJ gave little weight to Dr. Utah's opinion, finding it inconsistent with other evidence in the record and her own examination notes. (R. at 24–25.) Plaintiff claims that the ALJ failed to explain how Dr. Utah's examinations of Plaintiff conflicted with her opinion. (Pl.'s Mem. at 10.) Yet, the ALJ cited Dr. Utah's mental status examinations within the record to demonstrate the internal inconsistencies within her opinion. (R. at 25.) The ALJ also cited the findings of the state agency disability experts as evidence in the record that conflicted with Dr. Utah's opinion. (R. at 24–25.) Specifically, Dr. Utah's own treatment records of Plaintiff and those from other medical sources indicate that Plaintiff had the following normal functioning capabilities: intact registry, immediate recall, no memory problems and intact repetition. (R. at 1032, 1559, 1689, 1795.) Substantial evidence in the record supports the ALJ's decision.

Dr. Utah assessed Plaintiff with generally normal mental functioning during the majority of Plaintiff's mental status examinations. (R. at 1042, 1070, 1141, 1222, 1695, 1813.) On August 29, 2014, Plaintiff first presented to Dr. Utah regarding his PTSD, major depressive disorder and alcohol-use disorder. (R. at 1221.) Plaintiff appeared alert, awake, oriented, and appropriately groomed, and he maintained good eye contact throughout the exam. (R. at 1222.) Plaintiff behaved calmly and cooperatively, and he spoke with a normal rate and tone. (R. at 1222.) Dr. Utah reported that Plaintiff exhibited no abnormal movements and had fair judgment and insight. (R. at 1222.) Plaintiff denied homicidal or suicidal ideation, and he showed a spontaneous, linear, logical and goal-directed thought process. (R. at 1222.) He exhibited an euthymic mood, and he had an appropriate and mood congruent affect. (R. at 1222.) Plaintiff also denied having nightmares or flashbacks. (R. at 1222.) Dr. Utah ordered Plaintiff to continue taking Prozac, Trazodone for his sleep disorder, prazocin for his nightmares and klonopin for his anxiety/restless leg syndrome. (R. at 1223.)

18

On October 24, 2014, Plaintiff followed-up with Dr. Utah. (R. at 1140.) During the mental status examination, Plaintiff again presented alert, awake and oriented. (R. at 1141.) As before, he appeared appropriately groomed, calm and cooperative. (R. at 1141.) In fact, Plaintiff's next four visits to Dr. Utah yielded largely similar results. (R. at 1042, 1070, 1141, 1695, 1813.) Plaintiff always appeared appropriately groomed, maintained good eye contact, spoke with a normal tone and demonstrated fair judgment and insight. (R. at 1042, 1070, 1141, 1222, 1695, 1813.) Plaintiff described his mood as "not doing good," and Dr. Utah noted that he suffered from nightmares and flashbacks. (R. at 1141.) However, Plaintiff consistently denied homicidal or suicidal ideation, and he exhibited spontaneous, linear, logical and goal-directed thought process. (R. at 1042, 1070, 1141, 1222, 1695, 1813.) Dr. Utah advised Plaintiff to discontinue Prozac — as it caused Plaintiff irritability and agitation — and Adderall. (R. at 1142.) Dr. Utah also advised Plaintiff to stop taking Trazodone and Prazosin for about three days to see if he noticed a significant difference. (R. at 1142.) She then prescribed Venlafaxine to treat Plaintiff's depression. (R. at 1142.)

On December 12, 2014, Plaintiff returned to Dr. Utah with similarly normal results. (R. at 1069–70.) Plaintiff appeared appropriately groomed, alert, awake and oriented. (R. at 1070.) Plaintiff did have a "depressed, anxious" mood and depressed affect, but he remained calm and cooperative. (R. at 1070.) Dr. Utah again noted Plaintiff's frequent nightmares and flashbacks. (R. at 1070.) Dr. Utah recommended Sertraline as a replacement for Prozac and continued therapy sessions. (R. at 1072.)

On January 14, 2015, during a consultation with Dr. Utah, Plaintiff appeared normal throughout the mental status examination. (R. at 1042.) In fact, Dr. Utah's notes remained largely the same as her notes from August, October and December 2014. (R. at 1042, 1070,

1141, 1222.) Plaintiff's mood improved to "okay," and he showed an appropriate, full range, and mood congruent affect. (R. at 1042.) Dr. Utah increased Plaintiff's Zoloft and Prazosin dosages to target his nightmares. (R. at 1043.) She also advised Plaintiff to continue his current medication regimen and therapy sessions and return in two months. (R. at 1043.)

On August 6, 2015, Plaintiff once again appeared normal during his mental status examination with Dr. Utah. (R. at 1812–13.) Plaintiff exhibited a "numb" mood and "restricted" affect, but otherwise appeared appropriately groomed, calm and cooperative. (R. at 1813.) Dr. Utah noted that Plaintiff experienced only occasional nightmares and flashbacks. (R. at 1813.)

On November 11, 2015, Plaintiff's last visit to Dr. Utah yielded another generally normal mental examination. (R. at 1695.) Again, Plaintiff appeared largely the same as previous exams. (R. at 1042, 1070, 1141, 1222, 1695, 1813.) Of note, Plaintiff's mood improved to "same, okay," and he exhibited a restricted affect. (R. at 1695, 1813.) Dr. Utah increased Plaintiff's Prazosin dosage for frequent nightmares and flashbacks, and she prescribed Latuda to treat his depression. (R. at 1697.) Dr. Utah also noted that Plaintiff attended individual psychotherapy for one year, but did not find it helpful. (R. at 1697.) Plaintiff declined a coping skills group, but he went to Vet Centers. (R. at 1697.)

Dr. Utah's opinion that Plaintiff would miss work more than three times per month directly conflicts with her consistently unremarkable observations. Dr. Utah's own observation notes indicated that Plaintiff repeatedly had a spontaneous, linear, logical and goal-directed thought process. (R. at 1042, 1070, 1141, 1222, 1695, 1813.) During each exam Dr. Utah observed that Plaintiff appeared appropriately groomed, alert, awake and oriented, which contradicts her opinion that Plaintiff had a low energy level and loss of interest. (R. at 1042, 1070, 1141, 1222, 1613, 1695, 1813.) Plaintiff repeatedly demonstrated the ability to cooperate

20

and behave calmly, and he consistently showed fair judgment. (R. at 1042, 1070, 1141, 1222, 1695, 1813.)

Additionally, Plaintiff did not demonstrate "vigilance and scanning" as indicated by Dr. Utah's opinion, but rather always maintained good eye contact as well as normal speech and tone. (R. at 1042, 1070, 1141, 1222, 1611, 1695, 1813.) In her opinion, Dr. Utah correctly noted that Plaintiff had frequent nightmares and flashbacks. (R. at 1042, 1070, 1141, 1222, 1611, 1695, 1813.) However, he never exhibited suicidal or homicidal ideation. (R. at 1042, 1070, 1141, 1222, 1695, 1813.) In fact, Dr. Utah assessed Plaintiff as only moderately depressed, and failed to specify how or why his mental condition would affect his ability to work. (R. at 1612.) Dr. Utah's treatment records show that Plaintiff had variant moods, but she prescribed medications to treat them. (R. at 1697.) Moreover, Plaintiff's consistent ability to function and maintain normal thought process during his mental exams shows that Dr. Utah's opinion conflicts with her own observations.  (R. at 1042, 1070, 1141, 1222, 1695, 1813.)

Other objective medical evidence in the record also conflicts with Dr. Utah's opinion. On June 11, 2014, Plaintiff consulted with Eugene Gourley, Ph.D., a clinical psychologist who noted Plaintiff's well-groomed appearance, normal activity, good judgment, good insight and cooperative, attentive and interested attitude. (R. at 996.) Plaintiff displayed an anxious mood and affect, and his thought content showed "obsession." (R. at 996.) However, Dr. Gourley observed no abnormalities in Plaintiff's perception, and his thought process appeared normal and goal-directed. (R. at 996.)

On November 3, 2014, Dr. Gourley conducted several tests to assess Plaintiff's cognitive strength. (R. at 1105.) The results showed that Plaintiff had "significant weaknesses on tasks assessing aspects of processing speed, sustained attention, and verbal memory." (R. at 1115.)

However, he had an average working memory, digit recall and ability to sequence auditory information. (R. at 1115.) Dr. Gourley concluded that Plaintiff had "significant difficulties sustaining attention over time" for certain tasks, and consequently, he would "likely [] have more difficulty . . . in cognitively demanding situations, particularly when required to multi-task or process more complex, detailed information." (R. at 1115–17.) Dr. Gourley also opined that Plaintiff would struggle with complex verbal directives or multi-step instructions. (R. at 1117.) Dr. Gourley's treatment included strategies to help Plaintiff manage his "functional attention and concentration problems at work or home[.]" (R. at 1118.) During the examination, Dr. Gourley found Plaintiff appropriately dressed and groomed, polite, friendly, cooperative and forthcoming with information. (R. at 1108.) Plaintiff had a clear, alert, oriented and rational mental status. (R. at 1108.) He appeared anxious, but had generally appropriate affect and normal speech. (R. at 1108.)

On October 25, 2014, gastroenterologist Tommy Pacana, M.D., examined Plaintiff. (R. at 1124.) Plaintiff appeared appropriately groomed, exhibited a cooperative attitude and showed normal activity and speech. (R. at 1130.) Although Plaintiff presented an anxious mood and affect, he had normal thought flow and no abnormality in perception or thought content. (R. at 1130–31.) In fact, Dr. Pacana's observations mirrored Dr. Utah's observations during her examinations of Plaintiff. (R. at 1130–31, 1042, 1070, 1130–31, 1141, 1222, 1695, 1813.)

During a general physical exam on May 26, 2015, Dr. Seigel noted that Plaintiff had no anxiety, depression, hallucinations, delusions, memory problems or acute distress. (R. at 1559–60.) Rather, he appeared alert, awake and oriented as in his other mental examinations. (R. at 1560.)

22

Dr. Utah's opinion that Plaintiff could not maintain a regular job or would miss work more than three times per month does not comport with Plaintiff's mental status examinations in the record. Dr. Utah opined that Plaintiff had marked difficulties in maintaining social functioning, as well as concentration, persistence or pace. (R. at 1613.) However, throughout the record, Plaintiff showed an ability to act both alert and oriented and also exercise fair judgment. Indeed, Dr. Gourley even suggested coping mechanisms and strategies for Plaintiff's *moderate* limitations, so that Plaintiff could manage his "functional attention and concentration problems at *work* or home." (R. at 1118 (emphasis added).)

Although Plaintiff had difficulty with processing speed, sustaining attention for prolonged time periods, sustaining verbal memory, multi-tasking and understanding complex information, objective medical evidence repeatedly described him as rational, cooperative and attentive. (R. at 1042, 1070, 1115–17, 1141, 1222, 1695, 1813.) Plaintiff also exhibited an average working memory and recall abilities. (R. at 1115.) Hence, Dr. Utah's opinion does not accurately reflect Plaintiff's limitations.

Dr. Utah's own medical examinations and objective medical evidence from Plaintiff's other treating sources support the ALJ's decision to give less weight to Dr. Utah's ultimate opinion. Consequently, the ALJ did not err in this decision.

### 3. Dr. Harris's Opinion

On February 17, 2016, Dr. Harris, a licensed clinical psychologist, conducted a mental status evaluation of Plaintiff upon referral from Richmond's Disability Determination Services. (R. at 1924, 1933.) Dr. Harris opined that Plaintiff likely could not perform complex and detailed tasks, maintain regular attendance, or perform work activities on a consistent basis. (R. at 1929.) Plaintiff disputes the ALJ's assignment of little weight to Dr. Harris's opinion,

23

because the report appeared consistent with Plaintiff's symptoms, Dr. Utah's opinion and the record as a whole. (Pl.'s Mem. at 12.) However, the ALJ assigned little weight to this opinion, because he found "her opinion [] generally inconsistent with [Plaintiff's] reported activities of driving and ability to follow verbal instructions." (R. at 25.)

The record supports the ALJ's determination that Plaintiff had difficulty performing complex and detailed tasks, but not Dr. Harris's opinion that Plaintiff could not attend work regularly or perform work activities in general. (R. at 1115–18, 1929–30.) Indeed, during the hearing, Plaintiff testified that he could follow simple verbal instructions and drive. (R. at 45–46.)

As discussed above, the treatment notes from Dr. Seigel, Dr. Utah, and Dr. Gourley indicate that Plaintiff had fewer limitations than Dr. Harris alleged. Plaintiff exhibited normal functioning, speech and behavioral capabilities. Moreover, Plaintiff consistently cooperated with his doctors during examinations. (R. at 1042, 1070, 1141, 1222, 1695, 1813.) Finally, Dr. Gourley's comprehensive mental examination of Plaintiff's cognitive strengths and weaknesses directly refutes Dr. Harris' claims by showing that Plaintiff could work and manage his cognitive weaknesses using work-friendly strategies. (R. at 1118.) Thus, substantial evidence in the record supports the ALJ's assignment of weight to Dr. Harris's opinion.

### 4. Mr. Moffett's Opinion.

On November 10, 2015, Carlos Moffett, a licensed kinesiotherapist, evaluated Plaintiff's functional capacity. (R. at 1863–64, 1866.) Mr. Moffett monitored Plaintiff's performance during a physical performance test. (R. at 1864.) Mr. Moffett noted that Plaintiff had a "very unsteady gait" and assessed him as a medium fall risk. (R. at 1864–65.) Mr. Moffett also noted that Plaintiff could not sit for prolonged time periods due to numbness nor stand for prolonged

24

time periods without assistance for balancing. (R. at 1865.) Mr. Moffett reported that Plaintiff should avoid squats, stooping and bending. (R. at 1865.) He also noted that Plaintiff should only lift ten to fifteen pounds, and could not crawl or coordinate his fingers. (R. at 1865.) In the same assessment, Mr. Moffett later noted that Plaintiff could only safely lift a maximum of eight pounds because of poor "mechanics." (R. at 1866.) Moreover, Mr. Moffett noted that Plaintiff could climb sixteen steps with a single hand rail, but he had difficulty walking and climbing stairs. (R. at 1865.) Additionally, Mr. Moffett observed that Plaintiff could kneel with sturdy support, but he could not sustain a static position. (R. at 1866.)

Plaintiff challenges the weight given to Mr. Moffett's opinion. (Pl's Mem. at 8.) The ALJ explained that he assigned little weight to Mr. Moffett's opinion, because he qualified as "a non-acceptable medical source who did not provide an opinion regarding the claimant's ability to engage in work related activities." (R. at 25.) Under the regulations, the ALJ can only consider an "acceptable medical source" as a treating source entitled to controlling weight. SSR 06-03p, at *2.[3] The ALJ properly assigned little weight to Mr. Moffett's opinion, because as a kinesiotherapist, Mr. Moffett does not qualify as an "acceptable medical source." 20 C.F.R. § 404.1513(a). Instead, Mr. Moffett qualifies as an "other source," from whom the ALJ can consider evidence of the severity of Plaintiff's impairments and their effect on his ability to work. *See* § 404.1513(d)(1) (noting that other medical sources include therapists). Thus, the ALJ properly considered Mr. Moffett's opinion.

Moreover, the ALJ appropriately noted that Mr. Moffett did not comment on Plaintiff's ability to engage in work-related activities. (R. at 25.) Like Dr. Seigel, Mr. Moffett noted that

---

[3]    Effective March 27, 2017, the SSA rescinded SSR 06-03p, instead incorporating some of the Ruling's policies into 20 C.F.R. § 404.1527. 82 Fed. Reg. 5844-01, at 5844–45, 5854–55 (Jan. 18, 2017). As stated in footnote 2, the Agency cannot engage in retroactive rulemaking. Thus, SSR 06-03p applies to Plaintiff's claim.

Plaintiff had difficulty with prolonged sitting and standing, bending, stooping and lifting. (R. at 1033, 1538, 1540, 1822, 1843, 1865.) However, Mr. Moffett largely assessed Plaintiff's limitations on Plaintiff's willingness to perform certain tests. (R. at 1843–44.) For example, Plaintiff avoided stooping, bending and crawling because of his fear of falling. (R. at 1843.)

Additionally, Mr. Moffett's report conflicted internally and with the record. For example, Mr. Moffett listed two different maximum lifting weights for Plaintiff in his report. (R. at 1865–66.) Mr. Moffett noted that Plaintiff had severe issues balancing and coordinating, but no other treating physician identified such difficulties. (R. at 1538–40, 1843.) In fact, Dr. Seigel found that Plaintiff had fewer restrictions than Mr. Moffett. (R. at 1542–43.) For example, Dr. Seigel reported that Plaintiff did not have any other pertinent physical findings, conditions, signs or symptoms related to his lumbar spine condition. (R. at 1543.) Mr. Moffett indicated that Plaintiff could not coordinate his hands without stiffness, but Dr. Seigel did not find any difficulty with hand coordination. (R. at 1543, 1843.) Instead, Dr. Seigel noted that Plaintiff did not have constant pain, but did have severe intermittent pain (usually dull), moderate paresthesias and/or dysesthesias and moderate numbness in his lower left and right extremities. (R. at 1542.)

Although Plaintiff's back pain affected his gait, he had normal strength in his hip flexion, knee extension, ankle plantar flexion, ankle dorsiflexion and great toe extension. (R. at 1540–41.) Dr. Seigel did not indicate any balance or coordination difficulties, but instead only mentioned that Plaintiff's spinal condition would preclude him from prolonged standing, sitting and walking, frequent bending at the waist and heavy lifting. (R. at 1544.) Thus, Mr. Moffett's report conflicted with substantial evidence in the record.

26

As described above, Plaintiff's objective medical records, routine care and daily activities support the ALJ's decision to assign little weight to the opinions of Plaintiff's treating physicians and Mr. Moffett. The ALJ reviewed all of the relevant evidence and gave specific reasons for the weight given to the respective medical opinions. Because substantial evidence supports the ALJ's decision, he did not err in evaluating these opinions.

## B. The ALJ erred in assessing the VA disability determination.

Plaintiff next argues that the ALJ erred in assessing the VA's disability determination, because he did not give it substantial weight. (Pl.'s Mem. at 14). Defendant maintains that the ALJ afforded appropriate consideration to Plaintiff's VA disability rating. (Def.'s Mem. at 23.)

While disability determinations made by other governmental agencies do not bind the SSA, the ALJ still must "evaluate all the evidence in the case record that may have a bearing on [the] determination or decision of disability." SSR 06-03p. In *Bird v. Commissioner of Social Security*, 699 F.3d 337 (4th Cir. 2012), the Fourth Circuit directly addressed the weight that an ALJ assigns to the determinations of the VA.[4] The Fourth Circuit acknowledged that the SSA and the VA apply different standards in determining disability, but noted that both agencies "serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability," and that both require extensive medical documentation. *Bird*, 699 F.3d at 343. As a result, a disability rating by one of the two agencies remains "highly relevant to the disability determination of the other." *Id.* Accordingly, an ALJ must presumptively afford a VA determination substantial weight. *Id.*

---

[4]    Effective March 27, 2017, the SSA no longer analyzes decisions made by other agencies. 20 C.F.R. § 404.1504 (2017). Thus, *Bird* does not control claims filed on or after March 27, 2017. Because Plaintiff filed his claim in 2014, however, *Bird* applies here.

However, the Fourth Circuit also recognized that the "SSA employs its own standards for evaluating a claimant's alleged disability, and the effective date of coverage . . . under the two programs will likely vary." *Id.* Therefore, the Commissioner may afford a VA determination less than substantial weight if "the record before the ALJ *clearly demonstrates* that such a deviation is appropriate." *Id.* (emphasis added).

To satisfy the *Bird* standard, the ALJ may not dismiss a VA rating decision in a conclusory fashion. *Parker v. Colvin*, 2015 WL 5561213, at *15 (E.D. Va. Sept. 11, 2015). Rather, the ALJ must discuss, in detail, why the VA determination deserves only limited weight. *Id.* For example, the court in *Sykes v. Berryhill* noted that an ALJ satisfied *Bird* by using "a full page of analysis" to explain inconsistences between the plaintiff's testimony, medical records and the VA rating, and to detail the reasons for affording the VA determination less than substantial weight. 2017 WL 4401480, at *11 n. 12 (E.D. Va. Aug. 25, 2017), *R. & R. adopted*, 2017 WL 4381682 (E.D. Va. Oct. 2, 2017).

"When the ALJ has not weighed the disability determination of another governmental entity in accordance with the Fourth Circuit's *Bird* decision, remand is the appropriate remedy." *Idlett v. Berryhill*, 2017 WL 2371831, at *4 (E.D. Va. May 5, 2017), *R. & R. adopted*, 2017 WL 2374394 (E.D. Va. May 31, 2017); *see also Cochran v. Colvin*, 2016 WL 8453568, at *5 (E.D. Va. Dec. 28, 2016), *R. & R. adopted*, 2017 WL 889621 (E.D. Va. Mar. 6, 2017) (noting that "remand is typically required" when an ALJ fails to properly explain his reasons for affording less than substantial weight to a VA disability rating); *Lee v. Colvin*, 2016 WL 5741538, at *7 (E.D. Va. Nov. 29, 2016) (remanding where the ALJ failed to provide "cogent reasons" for declining to attribute substantial weight to VA disability ratings); *Persaud v. Colvin*, 2014 WL 198922, at *10 (E.D. Va. Jan. 14, 2014) (stating that "[t]he Fourth Circuit has now made it clear

that the ALJ must give the VA's disability rating 'substantial weight' or explicitly detail the reasons for giving it less weight.").

Here, the ALJ considered the VA's disability determination and gave it "some weight." (R. at 25.) On May 3, 2015, the VA determined that Plaintiff had 100% service-connected disability. (R. at 175.) The VA allotted the following ratings for Plaintiff's relevant service-connected disabilities: 70% for PTSD; 40% for fibromyalgia with headaches, Raynaud's and bilateral upper extremity peripheral neuropathy; 30% for IBS; and, 20% for lumbar spine degenerative disease. (R. at 177.) After reviewing the VA disability rating, the ALJ afforded it "some weight," because he found the rating "generally inconsistent with the evidence of record and [Plaintiff's] reported activities of cooking, driving, and showering without assistance." (R. at 25.)

The ALJ misstated and misapplied *Bird*. First, the ALJ misstated the *Bird* standard when he wrote that "[VA] decisions deserve substantial weight unless there are *good reasons* for giving them less weight." (R. at 25 (emphasis added).) *Bird* requires that the ALJ give substantial weight to the VA's determination unless the record "*clearly demonstrates* that such a deviation is appropriate." *Bird*, 699 F.3d at 343 (emphasis added). Second, the ALJ misapplied the *Bird* standard when he failed to sufficiently explain why he afforded only some weight to the VA disability rating. (R. at 25.) Unlike the ALJ in *Sykes*, who used a "full page of analysis" to explain why the plaintiff's VA determination deserved less than substantial weight, the ALJ here addressed the VA's decision in a conclusory manner, citing generally to the record and Plaintiff's daily activities in a single sentence. 2017 WL 4401480, at *11 n.12; (R. at 25.)

If the ALJ had explained in specific and sufficient detail why he gave little weight to the VA disability determination, then his application of the improper standard may have resulted in

harmless error. However, the insufficient explanation of the alleged inconsistencies between the VA's decision and the record precludes the Court from meaningful review of his decision. Thus, the ALJ's failure to apply the proper standard and fully explain his decision in accordance with the Fourth Circuit's decision in *Bird* warrants remand.

## V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 12) be DENIED and that the final decision of the Commissioner be REVERSED and REMANDED for further administrative proceedings consistent with this Report and Recommendation.

Let the clerk forward a copy of this Report and Recommendation to the United States District Judge M. Hannah Lauck and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  January 18, 2018

30